**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**MARTHA SMITH, BRIAN SMITH,
SHAWN SMITH**                                                                                          **PLAINTIFF**

VS.                                    NO. 4:05CV001930

**CITY OF JACKSONVILLE; A Municipal
Corporation; and BRETT HIBBS; AMANDA
CHAPMAN; KIMBERLY LETT; ROBERT
SLASH; CHRIS ERICKSON; SETH CORBEN;
JERRY KEEFER; RUSSELL NUSSER;
CHARLES HUGHES, in their individual and
official capacities**                                                                                   **DEFENDANTS**

**ORDER**

Pending is Defendants' motion for summary judgment. (Docket # 30). Plaintiffs have responded and Defendants have filed a reply. For the reasons set forth herein, Defendants' motion is denied.

Facts

On March 2, 2005, a "no-knock" search warrant was issued for the property located at 104 Overland Trail. The warrant was issued after surveillance was conducted on 104 Overland Trail by Detectives Kimberly Lett and Amanda Chapman. The Smith residence, 108 Overland Trail, is located two (2) houses down from 104 Overland Trail. Both 104 and 108 Overland Trail are green houses. However, the houses are different in that there is a carport on the front left side of 108 and there is no carport on the front of 104; there is a large bay window on the left front of 104 and no bay window on 108; there is a large tree in the front yard of 104 and no tree in the yard of 108, and there is a side-oriented peak in the roof on the right side of 104 and no peak in

the roof of 108.

After the search warrant was issued, the entry team of the Jacksonville Police Department gathered for a briefing on March 3, 2005, wherein members of the entry team were shown pictures of 104 Overland Trail and each team member was assigned their role in the entry of the residence.  During the briefing, Officers Robert Slash, Chris Erickson, Seth Corben, Jerry Keefer, Charles Hughes and John Alberson were assigned the task of breaching the house.  The entry team was told they would be transported to Overland Trail, but would stop at the left side of 106 Overland Trail, in order to avoid being detected by a surveillance camera affixed by the front door of the target house.  The purpose of the entry team is to assist in breaching and securing houses and their occupants which are the subject of search warrants.  After the briefing on March 3, 2005, Sergeant Brett Hibbs, Detective Chapman, Officers Robert Slash, Chris Erickson, Seth Corben, Jerry Keefer and Charles Hughes loaded into a van and proceeded to 104 Overland Trail to execute the search warrant. Officers Alberson and Regina Boyd and canine Dan were also in the van.  Sergeant Nusser was not in the van, but followed in a detective's vehicle.  Detective Melissa Williams and Jim Burnett also followed in separate vehicles.  Sergeant Hibbs drove the van to a "staging area" in the near vicinity of 104 Overland Trail where the procedure for the entry was reviewed one last time. Sgt. Hibbs had not previously viewed in person the home subject to the search warrant, a step not required by City policy at the time. After leaving the staging area, Sergeant Hibbs received various radio communications from Detective Lett, who was conducting surveillance from an unmarked vehicle on Overland Trail.

Defendants assert that Sergeant Hibbs received a radio communication in which Detective Lett stated that two (2) males walked up to 104 Overland Trail from a few houses

down.  As a result of this communication, Defendants claim that Sgt. Hibbs decided to stop in front of the target house instead of a few houses down, as originally planned.  Defendants contend that Sgt. Hibbs proceeded down Overland Trail and saw two males matching Detective Lett's description standing outside 108 Overland Trail.  Upon seeing these individuals, Sgt Hibbs believed they were standing in front of the target house, stopped the van in front of 108 Overland Trail and informed the entry team that the van was stopped in front of the target house.

Plaintiffs deny that the alleged communication from Detective Lett identifying two individuals in front of the target house occurred.   In fact, Plaintiffs presented evidence that before Sgt. Hibbs stopped the van in front of 108 Overland Trail, there were two transmissions from Detective Lett, the first stating that there were 5 or 6 persons at "the house" and the second that there were 2 gentlemen standing "two houses down."  Further, Plaintiffs argue that in her written statement, Officer Regina Boyd who was in the truck, stated that "as the vehicle stopped Detective Chapman was yelling "wrong house, wrong house."

The entry team exited the van in front of 108 Overland Trail.  Sgt. Hibbs and Nusser detained the two males, Brian Smith and his friend, Todd Conley, standing in front of 108 Overland Trail by having them get down on the ground and handcuffing the individuals. Plaintiffs contend that the Defendants pointed guns at these two men at close range.

Officers Robert Slash, Chris Erickson, Seth Corben and  Jerry Keefer  went to the carport on the left side of 108 Overland Trail, used a ram to breach the carport door and entered the home.  While approaching 108 Overland, Chapman, Alberson and Hughes noticed that they were at the wrong house.  They called out to their fellow team members that they were at the wrong house, then ran to 104 Overland Trail to assist other detectives who had arrived at the target

3

house. After Sgt. Hibbs detained Conley and Brian Smith, he immediately followed the other four officers into the Smith residence through the carport door.

The only occupant of the Smith house was Martha Smith, who was told by the officers to get down on the floor. The officers were in full swat gear and pointed weapons at Ms. Smith. Ms. Smith replied "You're in the wrong house. You can't tell me to get on the floor. This is my home. You're invading my privacy. Do not touch me. I have medical problems. I'm under a doctor's care." Because Ms. Smith did not get down on the ground, Officer Keefer took hold of her arm and took her to the ground. Keefer stated that he pushed Smith to the floor with his right foot on the left side of her back. The officers searched the remainder of the rooms of the house. Defendant Erickson broke into one room when they found it to be locked.

After the time at which the officers who entered 108 Overland Trail recognized it was the wrong house, an officer, at Brian Smith's request, allowed Ms. China Newman to enter the Smith residence to check on Martha Smith. She observed Ms. Smith to be in handcuffs, hysterical, and suffering from an asthma attack. Ms. Smith remained handcuffed for a time after the error was known because no officer in the house had a key for the handcuffs. While Ms. Newman was in the house, Martha Smith spoke on the telephone to her son Shawn Smith and pleaded with him to come home.

When the handcuffs were removed from Ms. Smith, two officers and Ms. Newman assisted Ms. Smith outside. She reached a point a few feet in front of the carport. She observed her son Shawn in handcuffs and because hysterical. Ms. Smith then collapsed. An ambulance arrived and took her to Rebsamen Medical Center in Jacksonville where she was seen in the emergency room. She was released that night.

After Hibbs entered the Smith's home, Defendant Nusser continued to detain Brian Smith and Conley in handcuffs. Even after the officers determined that they had entered the wrong home, they kept the two men in handcuffs but allowed them off the ground, secured their ID's and requested warrant checks on them. Over Brian Smith's protest, Nusser required them to walk to the front yard of 104 Overland Trail where they were lined up with about five other people in handcuffs. While in handcuffs at number 104, Brian saw his mother collapse in the driveway of their residence. His mother was gone by the time he returned to his yard.

After receiving the telephone call from his mother, Shawn Smith returned home. Upon turning onto Overland Trail, Shawn observed police cars and saw his brother, Brian, in front of number 104 in handcuffs. Shawn questioned his brother about what was going on and an officer told Shawn "hey, if you don't go on, I'm going to arrest you." Shawn drove his car to the front of his home, parked in the driveway, and began to walk up the driveway. In response to Officer Charles Hughes question, "where are you going, " Shawn responded "I live here." Officer Hughes had recognized that the residence at 108 Overland Trail was not the subject of the warrant approximately 16 minutes before Shawn arrived. Nevertheless, Hughes asked for Shawn's ID and Shawn responded "I don't have to show you anything, because I stay here." Officer Hughes approached Shawn and Shawn then proceeded to attempt to show the officer his ID, at this point, Hughes grabbed Smith's right arm, pulled it behind Smith's back, took him to the ground and handcuffed him. Shawn Smith remained handcuffed for a period of time.

Plaintiffs bring a total of eight claims against the City of Jacksonville and one or more members of the Jacksonville Police Department in their individual capacities. Defendants claim that they are entitled to summary judgment on seven of those claims. The Court will address

each of the seven claims herein.

## Standard for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided solely on legal grounds. *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56. The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry is the threshold inquiry of determining whether there is a need for trial -- whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The Eighth Circuit Court of Appeals has cautioned that summary judgment should be invoked carefully so that no person will be improperly deprived of a trial of disputed factual issues. *Inland Oil & Transport Co. v. United States*, 600 F.2d 725 (8th Cir. 1979), *cert. denied*, 444 U.S. 991 (1979). The Eighth Circuit set out the burden of the parties in connection with a summary judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the moving party for summary judgment is only to demonstrate, *i.e.*, '[to] point out to the District Court,' that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.

*Id.* at 1339. (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-274 (8th

Cir. 1988) (citations omitted)(brackets in original)).  Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248.

## Discussion

Each of the three Plaintiffs brings a claim for unreasonable search of his or her residence against seven individual Defendants and the City of Jacksonville.  Defendants argue that the search which was conducted pursuant to facially valid warrant does not run afoul of the constitution because the officers reasonably believed that they were entering the target house. The Eighth Circuit Court of Appeals has cautioned in a case involving the mistaken execution of a valid warrant on the wrong premises, "the Fourth Amendment's allowance for officers' honest mistakes is limited to mistakes that are objectively reasonable."  *Dawkins v. Graham*, 50 F.3d 532, 534(8th Cir. 1995) *citing, Maryland v. Garrison*, 480 U.S. 79, 87 & n. 11 (1987).   In *Dawkins*, the Court concluded that "the execution of a valid warrant on the wrong premises violates the Fourth Amendment if the officers should know the premises searched are not the premises described in the warrant, i.e., the officers' mistake is not objectively reasonable."  *Id.*

The Court finds that a question of fact exists as to whether the officers' mistake was objectively reasonable in this case.  Officers Slash, Erickson, Keefer and Corben entered Plaintiffs home after a briefing in which the target home at 104 Overland was described.  As set forth above, the residence at 104 and 108 were distinctly different.  Further, Plaintiffs present evidence that as the officers approached the residence other officers recognized the mistake and yelled out "wrong house."  Detective Hibbs also entered Plaintiffs' home after his participation in the detention of Brian Smith and Todd Conley.  Hibbs wrote in his statement that he "noticed

the house had a carport, not supposed to" and still walked in.  Officers Lett and Chapman did not enter Plaintiffs home, but Plaintiffs argue that their conduct in recognizing that the other officers were entering the wrong home, yet not stopping or warning them, caused the Plaintiffs to be subjected to a violation of their constitutional rights.  The Court finds that questions of fact exist as to whether Lett and Chapman violated Plaintiffs constitutional rights by their failure to intervene. Considering the evidence in the light most favorable to the Plaintiffs, the Court concludes that the Plaintiffs have presented sufficient evidence to create a genuine issue of material fact as to their unreasonable search claims.

Plaintiffs also assert three claims for unreasonable seizure.  The Complaint alleges a claim for unreasonable seizure on behalf of Brian Smith against Defendants Hibbs and Nusser as well as the City; Martha Smith states a claim of unreasonable seizure against Defendants Keefer, Slash and the City, and Defendant Shawn Smith asserts an unreasonable seizure claim against Defendant Hughes and the City.  Defendants do not address the claim of Brian Smith accordingly, the Court will examine the claims of Martha and Shawn Smith.

Defendants argue that "because the officers believed that they were at the correct house, it was reasonable for them to handcuff Martha Smith."  As the Court has previously held, genuine issues of fact exist as to the reasonableness of the search of the residence, accordingly, summary judgment must be denied on the seizure claim as well.  As to Shawn Smith, the Court finds that genuine issues of fact exist as to whether Smith refused to comply with the request for identification and whether he was restrained for an unreasonable period of time after the police secured his identification.  Accordingly, the Court finds that genuine issues of material fact regarding both the initial seizure and the overall duration of the seizure exist.

Plaintiff Martha Smith asserts an excessive force claim against Defendant Keefer. Shawn Smith presents a claim for excessive force against Hughes. The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person. *Graham v. Connor*, 490 U.S. 386(1989); *Greiner v. City of Champlin*, 27 F.3d 1346 (8th Cir.1994). However, not every push or shove violates the Fourth Amendment. *Graham*, 490 U.S. at 396. Rather, the test is whether the force used to effect a particular seizure is "reasonable." *Id.* "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397(citation omitted).

Here, Martha Smith, age 55 and 5'2" tall was approached by four officers in full swat team gear. Defendant Keefer ordered her to the ground and she knelt down, when she refused to lay down, he pushed her to the floor with his foot on her back. Ms. Smith testified that he used his foot twice kicking her in the lower part of her back. During this time, Ms. Smith was saying "wrong house, and I can't breathe, I have asthma." The Court finds that under these circumstances a genuine issue of fact exists as to whether force was needed and whether such force was excessive under the circumstances.

As Shawn Smith approached his home he was asked "where are you going" and he responded that he lived there. Although the officers knew at this time that they had entered the wrong house, Officer Hughes, a 6'2" 245 pound officer approached Shawn who stands 5'9" and weighed 143 pounds. Shawn was asked to show his ID and he objected, when the officer approached Shawn he asked to reach for his wallet, at this point according to Smith, Hughes

9

grabbed Smith's right arm, yanked it behind his back and slammed him to the ground. Based upon these facts, the Court finds that a genuine issue of fact exists as to whether force was needed and whether such force was excessive under the circumstances.

Defendants contend that they are entitled to qualified immunity. Law enforcement officers are shielded by qualified immunity from civil liability if the officer "[did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). "Under the 'objective legal reasonableness standard,' courts are not to delve into the subjective motivation of the arresting officer". *Gorra v. Hanson,* 880 F.2d 95, 97 (8th Cir. 1989). In order to determine whether the Defendants are entitled to summary judgment based on qualified immunity, the Court must engage in a three-step inquiry: first, whether the Plaintiffs have asserted the violation of a constitutional right; second, whether this constitutional right was clearly established at the time the incident occurred; and third, viewing the facts in a light most favorable to the Plaintiffs, whether there is a genuine issue of material fact as to whether a reasonable official would have known that his actions violated that right. *Foulks v. Cole County, Mo.,* 991 F.2d 454, 456 (8th Cir.1993).

There is no question that the law prohibiting the officer's conduct was clearly established at the time of the search and seizure. Specifically, the right not to be subjected to the unreasonable mistaken execution of a valid search warrant was clearly established at the time of the search in this case. *See, Dawkins v. Graham*, 50 F. 3d 532, 534 (8th Cir. 1995) (wherein the Eighth Circuit held that the officers were not entitled to qualified immunity where the police officers' mistakenly executed a valid search warrant on the wrong premises.). Based upon the

facts set forth above, there is a material question of fact about whether the officers' entry of the home was a mistake amounting to plain incompetence. *Id.* "Qualified immunity does not protect plain incompetence." *Id., citing Hummel-Jones v. Strope*, 25 F.3d 647 (8th Cir. 1994).

Defendants also contend that the claims against the City of Jacksonville should be dismissed. To establish municipal liability under 42 U.S.C. § 1983, Plaintiffs must show that their constitutional rights were violated by an "action pursuant to official municipal policy" or misconduct so pervasive among non-policymaking employees of the municipality "as to constitute a 'custom or usage' with the force of law." *Ware v. Jackson County,* 150 F.3d 873, 880 (8th Cir.1998) citing, *Monell v. Department of Soc. Serv.*, 436 U.S. 658, 691 (1978). Policy is defined "as 'an official policy, a deliberate choice or a guiding principle or procedure made by an official with authority." *Shrum ex rel. v. Kluck*, 249 F.3d 773,779 (8th Cir. 2001).

Plaintiffs argue that the City is a proper Section 1983 Defendant because no policy of the Jacksonville Police Department required the team or its leader to view the target house in advance of the execution of the search. Allegations against the City for inadequate policies are properly analyzed under the failure to train standard. *Yellow Horse v. Pennington County*, 225 F. 3d 923 (8th Cir. 2000). A municipality may be liable for failure to train its employees when that failure can be shown to be deliberate indifference to the rights of others. *See, City of Canton* v. *Harris*, 489 U.S. 378, 389 (1989). The City must have had notice that its procedures were inadequate and likely to result in a violation of constitutional rights. *Larson by Larson v. Miller*, 76 F. 3d 1446 (8th Cir. 1996).

Plaintiffs argue that a reasonable jury, accepting Plaintiffs' evidence, could find: the need for an explicit requirement that the team leader, the person deciding and revising the plan for the

warrant's execution, view the target residence in advance was obvious; in the absence of such a requirement, the likelihood of a mistaken entry was considerable, and the absence of the requirement played a causal role in the error which occurred in this instance.  Considering the evidence in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have presented sufficient evidence to overcome the entry of summary judgment.

For these reasons, Defendants' motion for summary judgment is DENIED.

IT IS SO ORDERED this 15th day of May, 2007.

_____
James M. Moody
United States District Judge